# UNITED STATES DISTRICT COURT
# FOR THE
# DISTRICT OF COLUMBIA

**U.S. SECURITIES AND EXCHANGE COMMISSION,**
100 F Street, N.E.
Washington, DC 20549

        **Plaintiff,**

**v.**

**NIEL MARTIN NIELSON,**
326 Baltic Quay
1 Sweden Gate
London, England SE16 7TJ
United Kingdom

        **Defendant.**

Civil Action No. 18-1217

## COMPLAINT

The United States Securities and Exchange Commission ("SEC") alleges the following against Defendant Niel Martin Nielson ("Nielson"):

## SUMMARY OF ALLEGATIONS

1.      From at least November 2012 through April 2015, Niel Martin Nielson ("Nielson") orchestrated a microcap fraud at E-Waste Systems, Inc. ("EWSI"), a purported e-waste recycler that was created in 2011 through the combination of a private entity in the United Kingdom and a public non-operating shell company in the United States.

2.      Nielson, who was the CEO, President, and sole director of EWSI, issued frequent false and misleading statements in press releases and public filings to create the false impression that EWSI was expanding quickly across the world and, by mid-2013, earning millions of dollars in revenues each quarter.  The reality was that EWSI had no or virtually no operations at any point in time.  The vast majority of its agreements with third-party recyclers and other companies

had no economic substance, and some of the subsidiaries through which EWSI supposedly was conducting business were dormant or had yet to be formed.  Those agreements generated no revenue for EWSI ever.  Further, with respect to revenue from China, EWSI did not directly or indirectly manage or operate any businesses in China and had no legitimate basis for reporting revenue from China; Nielson had simply agreed to pay the owners of companies in China and individuals affiliated with a consulting firm in China to provide EWSI with financial data at the end of each quarter, which EWSI then reported as part of its consolidated financial results, creating the false appearance of growth and success.

3.      In late 2013, EWSI's long-time auditor (AUDITOR 1) resigned.  Soon thereafter, its newly hired auditor (AUDITOR 2) concluded from conversations with an employee of EWSI's consultant in China that there was no economic substance to EWSI's relationship with the companies in China, and EWSI should not have reported any revenue from China. AUDITOR 2 resigned immediately and a third auditor (AUDITOR 3) informed EWSI that revenue from China should not be included in EWSI's financial statements.  EWSI ceased to report revenue from China in 2014, and it restated to remove the revenue from China it had reported in 2013.

4.      In late 2013, Nielson also turned the public's attention to EWSI's supposed operations in Cincinnati, Ohio and Geneva, New York, which Nielson claimed would add millions more in revenue to EWSI's bottom line.  Nielson had no reasonable expectation that those locations would generate anywhere close to that amount of revenue, and those operations never ramped up.  EWSI was evicted from both locations in 2014, and since then has had no operations anywhere in the world.  Nielson did not disclose the true state of those operations and remained silent when the Cincinnati and Geneva operations were shut down.  Nielson, as

EWSI's sole officer and director, has not issued any press releases or filed any periodic reports with the SEC on EWSI's behalf since November 14, 2014.

5.      Nielson's actions, and the materially misleading statements and omissions that Nielson made on EWSI's behalf, artificially maintained and at times artificially increased EWSI's share price and trading volume.

6.      Nielson sold millions of EWSI shares into the market, profiting from the artificially increased share price and volume and causing harm to innocent investors.  He failed to disclose any of his sales of EWSI stock, and, from June 2011 onward, disclosed only four of his ten acquisitions of EWSI stock.

7.      By engaging in this conduct, Nielson violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b), 13(b)(5) and 16(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m((b)(5), 78p(a)] and Rules 10b-5, 13a-14, 13b2-1, 13b2-2, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b-1, 240.16a-3].  Pursuant to Exchange Act Section 20(e) [15 U.S.C. §78t(e)], Nielson also aided and abetted EWSI's violations of Exchange Act Sections 13(a) and 13(b)(2)(A) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

8.      The SEC brings this action seeking injunctive relief to prevent Nielson from committing future violations of the federal securities laws, disgorgement of Nielson's ill-gotten gains with prejudgment interest, civil penalties, an officer and director bar, a penny stock bar, and any other appropriate relief.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to Securities Act Sections

20(b), 20(d), and 22(a), Exchange Act Sections 21(d) and 27, and 28 U.S.C. § 1331.

10.     The District of Columbia is a proper venue for this action.  A substantial part of

the acts and omissions constituting violations of the federal securities laws occurred here in the

District of Columbia, where Nielson filed EWSI's materially false and misleading statements

with the SEC.  Additionally, Nielson resides in the U.K., and, pursuant to 28 U.S.C.

§ 1391(c)(3), any defendant not resident in the U.S. may be sued in any judicial district.

11.     Nielson, directly or indirectly, made use of the mails and of the means and

instrumentalities of interstate commerce in connection with the acts, practices, and courses of

business alleged in this Complaint.

## PARTIES AND RELATED ENTITIES

12.     **Nielson**, 65, is a U.S. citizen who resides in London, England.  Nielson has been

EWSI's President and CEO since June 2011, and, at all times relevant to this complaint, he was

EWSI's majority shareholder.  Nielson was also EWSI's Acting Chief Financial Officer from

June 22, 2011 to September 23, 2011; November 28, 2012 to December 21, 2012; and June 7,

2013 through the present.  He is currently EWSI's sole officer and director.

13.     **EWSI** is a Nevada corporation which lists, and at all relevant times has listed, a

Las Vegas, Nevada mailbox facility as its principal place of business.  EWSI was previously

known as Dragon Beverage, Inc., a non-operating shell company that purported to manufacture

and sell energy drinks.  On or about February 8, 2011, Dragon Beverage acquired 100 percent of

the outstanding shares of common stock of E-Waste Systems (UK) Ltd., a private company that

Nielson formed in the U.K. on the same date, which then became Dragon Beverage's wholly-

owned subsidiary.  On May 5, 2011, Dragon Beverage changed its name to E-Waste Systems, Inc.  On or about June 22, 2011, Nielson became EWSI's President and the Chair of its Board of Directors.  Nielson became EWSI's majority shareholder on or about December 9, 2011.  EWSI ceased all business operations by the end of 2014.

14.     EWSI has been a reporting company with the SEC pursuant to Exchange Act Section 12(g) since April 17, 2012.  EWSI has been delinquent in filing its periodic reports with the SEC since April 15, 2015, when it failed to file a Form 10-K for the period ending December 31, 2014.  The SEC suspended trading in EWSI's securities from August 11, 2017 through August 24, 2017; trading has not resumed since then.  Additionally, on November 21, 2017, an administrative law judge entered an initial decision revoking the registration of EWSI's securities.  The decision was ratified on January 23, 2018.  EWSI's opportunity to petition for review of that decision closed on February 13, 2018.

## FACTS

15.     On June 30, 2011, one week after becoming EWSI's CEO and President, Nielson announced that he had reorganized EWSI's operations and that its new mission is to create a global e-waste recycling and electronic asset recovery services company.  The announcement states that EWSI intends to enter the industry through acquisitions of high-quality companies with strong management teams.

16.     In the months and years to come, however, EWSI acquired only small companies on the brink of failure, whose meager operations it could not sustain, and it entered into so-called "teaming agreements" and licensing and branding agreements, which largely had no economic substance and resulted in zero revenue for the company.  These agreements, and others, created

the false appearance that EWSI was rapidly expanding across the U.S., Europe, and Asia, and growing successfully.

### EWSI Fails In Its Initial Foray Into E-Waste Recycling In The U.S.

17.     On October 20, 2011, under Nielson's control, EWSI acquired 100% of the issued capital stock of Tech Disposal, Inc. ("TDI"), an electronic recycler and asset recovery specialist in Columbus, Ohio.  TDI was renamed E-Waste Systems (Ohio), Inc. ("E-Waste Ohio") and became a wholly owned operating subsidiary of EWSI, but continued to be managed by its former owner.

18.     E-Waste Ohio was a small, two-truck operation that largely engaged in cash-based transactions.  The company principally purchased used copy machines, which it refurbished and resold or hauled to third-party facilities that E-Waste Ohio then paid to recycle the waste.

19.     E-Waste Ohio was not profitable under EWSI's ownership.  Its cash flow was ultimately insufficient to cover its operating expenses and the cost of servicing a $100,000 promissory note, the proceeds of which E-Waste Ohio had used to purchase inventory.

20.     On July 31, 2012, less than a year after EWSI acquired the business, Nielson reached an agreement to transfer E-Waste Ohio's business and assets back to the former owner for approximately $50,000.  By September 8, 2012, EWSI officially vacated the Columbus, Ohio premises.

21.      The E-Waste Ohio facility in Columbus, Ohio was EWSI's only operating facility, and was a significant subsidiary of EWSI.  EWSI did not file a Form 8-K disclosing the disposition of the business and assets as required by Item 2.01 of Form 8-K.

22.     EWSI made no public announcements about E-Waste Ohio until November 19, 2012, when it filed its Form 10-Q for the quarter ended September 30, 2012 ("Third Quarter 2012 Form 10-Q"), at which time it disclosed that E-Waste Ohio had ceased operations, its assets had been disposed of, and it had been dissolved.

23.     The Form 10-Q, which Nielson signed and certified, also states that EWSI has relocated to new premises in Columbus, Ohio, and plans to re-establish a new base of operations there.

24.     At the time of this disclosure, Nielson knew or was reckless in not knowing that EWSI had not moved to a new location in Ohio and did not have operations there or anywhere in the world.  EWSI had terminated its employees in Ohio, did not hire any new employees, and did not enter into a lease for, or transport any assets to, a new facility.  The employee upon whom EWSI relied to locate a new facility and continue operations had resigned in August 2012 after not being paid.

25.     EWSI's CFO resigned effective November 28, 2012, and two of its three Directors resigned effective November 30, 2012, less than two weeks after the Third Quarter 2012 Form 10-Q was filed.  Nielson hired a new CFO effective December 21, 2012, who resigned less than six months later.

### Despite No Operations In Ohio, Nielson Creates The False Impression That EWSI Has Great Profit Potential In Ohio

26.     On January 11, 2013, EWSI filed a Form 8-K with the SEC, in which Nielson proclaimed EWSI to be a "market-leading, integrated business" in the emerging e-waste industry and the only "pure-play public e-waste company."  The Form 8-K, which Nielson signed, describes EWSI's purported business plan, including entering into joint ventures and making acquisitions with companies that are "profit centers" and that have "local brand value, [an]

experienced management team, and solid commercial relationships with clients of strategic interest to EWSI."  EWSI's trading volume more than tripled and its share price increased 30% on this news.

27.     Soon thereafter, EWSI, through Nielson, began making a series of announcements which gave the misleading impression that EWSI was executing on its business plan, and using its supposed new facility in Columbus, Ohio, as a base for expansion across the U.S.

28.     For example, on January 29, 2013, EWSI filed a Form 8-K with the SEC announcing a one-year teaming agreement with Cinco Electronics, Inc., of Austin, Texas.  The agreement, which was attached to the Form 8-K, provides for EWSI and Cinco to share net profits on referred services.  The agreement also allows EWSI to identify Cinco's Austin, Texas and Grove City, Ohio facilities as part of its network and provides for EWSI to perform services at "EWSI's facilities in Columbus, OH" or at another agreed-upon location.  Nielson signed both the Form 8-K and the teaming agreement.  EWSI did not have a Columbus, Ohio facility at the time.

29.     EWSI, through Nielson, announced similar agreements with other companies.  On January 25, 2013, in a Form 8-K filed with the SEC, EWSI announced a one-year teaming agreement with Village Green Global Inc. of Huntington Beach, California.  On March 4, 2013, it announced in a Form 8-K a one-year teaming agreement with Isidore Electronics Recycling, of Los Angeles, California.  Two weeks later, on March 15, 2013, it announced in a Form 8-K a one-year teaming agreement with Forex Trading LLC, dba Semper Pacific Wealth Strategies, of San Diego, California.  Each of these agreements purports to establish a relationship between EWSI and the counterparty, pursuant to which the parties supposedly would refer business to each other and share profits on the referred services.  Each requires EWSI to process, or gives it

the option to process, referred e-waste at its supposed Columbus, Ohio facility, which did not actually exist at the time.  Each agreement expressly gives EWSI the right to identify the counterparty's facilities as its part of its network of processors.

30.     The reality was that these agreements lacked economic substance.  The counterparties had no obligation to refer business to EWSI and, indeed, no referrals were ever made.  No revenue was generated and no profits were shared under any teaming agreement.

31.     The teaming agreements and announcements were part of Nielson's strategy to create the impression that EWSI had a growing network of affiliates, a presence in Columbus, Ohio and the ability to process e-waste there, the potential for an expanded customer-base through referrals, and, in turn, increased profit potential.  Nielson made these announcements with the intent of supporting or increasing EWSI's trading volume and stock price by keeping EWSI in the news.  EWSI's announcements were often followed by an increase in the trading volume and/or price of EWSI's shares.

32.     Nielson perpetuated the false impression that EWSI had operations in Ohio throughout the spring of 2013.  By then, Nielson had devised a plan that would result in EWSI reporting revenue from outside of the U.S., including millions of dollars in revenue from China, so, he created a narrative that downplayed the relevance of Ohio to EWSI's future success, but that still conveyed the false impression that EWSI had a presence and operations in Ohio.

33.     Specifically, on April 1, 2013, EWSI filed a Form 8-K with the SEC, signed by Nielson, which appended a transcript of a purported interview (by EWSI employees) of Nielson. The transcript contains the following question and answer, among others:

> Q:  A **major part of your cash flow potential** appears to be built into the acquisition of e-waste processing facilities, such as **E-Waste Ohio**.  Can you provide an update on that operation?

A:  Ohio was the first step of many.  As you know, Ohio is the 10th largest state and an excellent location from a logistics standpoint.  **While we build out Ohio** it is actually more critical we secure more market presence in other places such as Los Angeles and Southern California where we now have an office, and other parts of the US, the UK and China.  So while **we will give some attention to Ohio**, it is not going to distract our attention.

(emphasis supplied).  At the time, EWSI was taking no steps to "build out" its Ohio operations. It had no Ohio operations.  But the narrative focused investor attention on the next unattainable sources of revenue – the U.K. and China.

### EWSI Next Purports To Expand Internationally

34.    While Nielson was announcing EWSI's expansion across the U.S. via teaming agreements, he was also entering into and announcing branding and licensing agreements outside of the U.S.  These agreements, like their domestic equivalents, lacked economic substance and were part of Nielson's efforts to create the false impression that EWSI was growing rapidly and successfully.

### The United Kingdom

35.    On February 27, 2013, Nielson announced in a press release that EWSI had signed an exclusive agreement with E-Waste Systems, Ltd. ("EWSI-UK"), a private company located in the U.K., granting it a Master License to process e-waste under EWSI's brand name in the U.K. and the Republic of Ireland for two years.  According to the press release, the agreement obligates EWSI-UK to pay EWSI an initial license fee of $75,000 plus 2% of annual revenues, with a "minimum commitment of $2,000,000 in revenues . . . ."  Nielson proclaimed that this agreement, along with previously announced agreements, helps to solidify EWSI's footprint in "the key major growth geographies" of the e-waste market.  EWSI's trading volume almost doubled after this announcement and its share price increased by 13.5%.

36.     On February 28, 2013, EWSI filed with the SEC a Form 8-K, signed by Nielson, which appended the misleading press release and EWSI's agreement with EWSI-UK.

37.     Nielson knew or was reckless in not knowing at the time of these announcements that the agreement with EWSI-UK had no economic value and that EWSI had undertaken no activity to expand into the U.K. or Ireland.  EWSI-UK was dormant at the time of the announcements.  It had no operations, no cash, and only £100 of net assets.  Not only was it incapable of generating royalties for EWSI, it could not generate even $1 in revenue, much less $2 million.  It had no ability even to pay the $75,000 initial licensing fee.

38.     Nielson controlled EWSI-UK at the time of the announcement, and less than one month after making the announcement, he caused EWSI-UK to be listed as a "dormant company" with the U.K. Companies House Registry.

39.     In its Form 10-Q for the period ended March 31, 2013 ("First Quarter 2013 Form 10-Q"), which Nielson signed and certified, EWSI publicly reported $75,000 in license fee revenue and a $75,000 receivable.  EWSI has never received the $75,000 fee or any royalty payments from EWSI-UK.

40.     Ultimately, AUDITOR 3, the independent audit firm that audited EWSI's fiscal year 2013 financial results, disallowed the revenue and receivable that EWSI had recorded from the EWSI-UK transaction.  The revenue and receivable associated with the EWSI-UK Master License Agreement were excluded from EWSI's financial statements for the year ended December 31, 2013; and, on July 2, 2014, EWSI filed an amended First Quarter 2013 Form 10-Q, which restated and removed the previously reported revenue and receivable from EWSI's first quarter 2013 results.

**India**

41.     On April 19, 2013, EWSI filed with the SEC a Form 8-K, signed by Nielson, which announced that EWSI had entered into a Strategic Brand Alliance Agreement with iTech Recycle Solutions America, of Houston, Texas.  The 8-K announced that the agreement "will allow for a possible entry into the market in India under [EWSI's] brand," and was described as part of EWSI's previously announced expansion strategy.

42.     On June 20, 2013, to create the false appearance of actual progress toward expansion into India, Nielson issued a press release in which he claimed that EWSI had formed a new subsidiary, EWS (Bharat) Ltd. ("EWS Bharat"), and entered into a Strategic Branding Alliance with a company called iTech Recycle LLC ("iTech").  The release states that iTech has "filed papers with the India[n] Government to sponsor a state sanctioned launch of an eWaste operation in conjunction with EWSI" and that Nielson will serve as iTech's non-executive Chairman in order to "maximize the support for the effort."  The release claims that, with the creation of this subsidiary and alliance, EWSI has "begun to establish [its] eWaste brand into South Asia and the north-eastern hemisphere" and also that EWSI is now the "first eWaste public pure play" in India.  EWSI's trading volume increased by 70% after this announcement.

43.     Nielson knew at the time of this announcement that EWSI had undertaken no activity to expand into India.  Neither EWS Bharat nor iTech existed at the time of the June 20, 2013 announcement.  Moreover, the only executed agreement between EWSI and any iTech-related entity was the branding agreement with iTech Recycle Solutions America that was announced on April 19, 2013, not with iTech Recycle LLC.

44.     Despite there being no subsidiary or agreement relating to business in India, Nielson approved accounting entries in which EWSI recorded $50,000 in license fee revenue and a $50,000 receivable from iTech for the second quarter of 2013.

45.     The branding agreement with iTech Recycle Solutions America did not provide for licensing or other fees.  When EWSI's auditor asked Nielson to provide support for the fees that were booked, Nielson gave the auditor a copy of a so-called Master License Agreement, which purportedly was signed on April 15, 2013, the same day the Strategic Alliance Agreement was signed.  On its face, the Master License Agreement requires iTech to pay EWSI an initial fee of $50,000 in the form of a license fee, and a 2% annual royalty on sales consummated under the EWSI brand, with a minimum guarantee of $2 million in gross revenues over the period of the agreement.

46.     Upon information and belief, Nielson drafted the Master License Agreement and signed a related board consent solely to support the accounting entries that he had previously approved, and he did so on or about August 19, 2013, and backdated both the Agreement and consent to April 15, 2013.

47.     In its Form 10-Q for the period ended June 30, 2013 ("Second Quarter 2013 Form 10-Q"), which Nielson signed and certified, EWSI publicly reported $50,000 in license fee revenue and a $50,000 receivable from iTech.  EWSI has never received a $50,000 licensing fee from any iTech entity, or any royalties.

48.     In January 2014, a potential shareholder contacted Nielson and noted that he was unable to locate information on EWS Bharat or iTech.  Nielson admitted to an EWSI employee that he had "overlooked" setting up EWSI Bharat and instructed the employee to incorporate it immediately.  On January 20, 2014, at Nielson's instruction, EWS Bharat was incorporated in

the U.K. under the name E-Waste Systems Bharat Ltd., with EWSI as its majority owner and Nielson as its sole director.

49.     Later in 2014, when AUDITOR 3 was conducting its audit of EWSI's fiscal year 2013 financials, it disallowed the revenue and receivable that EWSI had recorded from iTech, removing them from EWSI's financial statements for the year ended December 31, 2013. AUDITOR 3 also required EWSI to restate the iTech revenues and receivables that it had previously reported for the second quarter of 2013.  On May 20, 2014, EWSI filed a restated Form 10-Q for the period ended June 30, 2013, removing the revenue and receivable associated with iTech.

**EWSI Starts To Report Revenue**
**From Purportedly Leased Operations In China**

50.     In November 2012, Nielson turned to the services of a consulting firm in Shanghai, China ("Consulting Firm"), to help develop a strategy that would enable EWSI to appear not only that it was expanding globally but also that it was successfully generating revenues.  The Consulting Firm's Chairman and Managing Partner, Basilio Chen, claimed to have experience helping U.S. public companies expand into China.  What resulted from Nielson's consultations with Basilio Chen were a series of arrangements that made it appear that EWSI was involved in real activity in China and could report legitimate revenue from a number of companies in China, when in fact it was not and could not.

51.     In late March 2013, Nielson executed a set of agreements on EWSI's behalf, including an Operating Agreement and a Management Services Agreement, with a Chinese company named Shanghai YaZhuo Jiudian Gianli Youxian Gongsi ("YaZhuo").  YaZhuo was owned and controlled by a Consulting Firm employee.

52.     EWSI publicly announced these agreements in a Form 8-K dated April 2, 2013, which Nielson signed as CEO and Director.  The Form 8-K attaches EWSI's agreements with YaZhuo and describes them as establishing a relationship in which EWSI would provide management services to YaZhuo in connection with YaZhuo's current and proposed operations.

53.     The Operating Agreement purports to give EWSI the authority to appoint the members of YaZhuo's board of directors and to appoint its own senior management to the positions of Chief Executive Officer and President, Chief Financial Officer, and to other senior management positions at YaZhuo.  EWSI is to guarantee YaZhuo's contractual obligations to third parties.  In exchange, YaZhuo is required to adopt EWSI's corporate policies in the conduct of its daily operations, financial management, and relationship with employees.

54.     The Management Services Agreement purports to give EWSI both management and operational authority over YaZhuo's business, and entitles EWSI to participate in YaZhuo's profits and losses, including, among other things, any future business developments.  In exchange, YaZhuo is required to pay EWSI a quarterly management fee, in cash, equivalent to YaZhuo's net income.  The agreement also gives EWSI the right to conduct periodic audits of YaZhuo's books and records.

55.     Throughout 2013, including in its Forms 10-Q for the first, second, and third quarters of 2013, which Nielson signed and certified, Nielson publicly represented that EWSI was managing YaZhuo, directing its activities, including "the activities that most significantly impact YaZhuo's economic performance."  Each filing reiterates that EWSI is entitled to a

management services fee, payable quarterly, in an amount equivalent to YaZhuo's quarterly net income.[1]

56.     YaZhuo was a shell company with no operations of its own.  YaZhuo, in turn, entered into a series of agreements ("Lease and Operating Agreements") with companies in China ("China Companies"), which resulted in the revenue of those entities being passed through YaZhuo and recognized on EWSI's financial statements.  The written terms of the Lease and Operating Agreements were approved by Nielson and changed multiple times but, at their core, they provided for YaZhuo to take over the management and operations of the China Companies. In their final iteration, the agreements provided for YaZhuo to lease the operations of the China Companies on a quarter-to-quarter basis.  YaZhuo was required to pay each of the China Companies' rent, plus costs associated with leasing each company's employees, plus the net profit from operations less 5% of gross revenues.

57.     Each quarter, Nielson signed and certified EWSI's Forms 10-Q that identified new China Companies that EWSI purportedly was managing and operating through YaZhuo in China.

58.     For example, in its First Quarter 2013 Form 10-Q, EWSI claimed to be managing and consolidating the financial results with a company in China named Jiangsu ChengXiang Plastic Co., Ltd. ("JCP"), which it described as "a recycling company" that "holds patents for the recycling of plastics, including electronic waste plastics, which it then processes into new materials for the construction industry."  In its Second Quarter 2013 Form 10-Q, EWSI also claimed it was managing through YaZhuo the operations of Shanghai Yibao Shangwu Xinxi

---

[1]  Beginning with its Third Quarter 2013 Form 10-Q, filed on November 19, 2013, EWSI began  publicly to refer to YaZhuo as "Xufu Touzi Guanli Zixun (Shanghai) Youxian Gongsi" or "XuFu"; because YaZhuo and XuFu were different only in name, the SEC's complaint refers to both entities as "YaZhuo" throughout.

Zixun Yousian Gongsi ("eBao"), a consulting and specialized service business for the hospitality industry; and Shanghai City View Hotel Management and Shanghai Kunyan Jiudan Guanli (collectively, "City"), an "upscale hotel and leisure company, and one of the types of targets for [EWSI's] eWasteCC technology."  In its Third Quarter 2013 Form 10-Q, EWSI identified yet another Chinese company – Shanghai Xiatian Shiye Fazhan Youxian Gongsi ("XTS"), a ferrous metals trader – that it claimed to be managing through YaZhuo.

59.     EWSI also reported in each of its Forms 10-Q for 2013 that YaZhuo was a "consolidated variable interest entity" and as such that YaZhuo was consolidated into EWSI's financial statements.  EWSI disclosed that JCP was also consolidated into EWSI's financial statements in the first quarter of 2013.  For the second and third Quarters of 2013, EWSI disclosed and accounted for JCP, eBao, City, and XTS as businesses operated under leasehold contracts, and recognized the businesses' revenues and cost of operations in EWSI's financial statements.

60.     Approximately $4,000 of the $229,000 in revenues reported in EWSI's First Quarter 2013 Form 10-Q, or 2% of the total, were related to YaZhuo and the China Companies. Approximately $2.4 million, or more than 85% of the total revenues reported in EWSI's Second Quarter 2013 Form 10-Q, were related to YaZhuo and the China Companies, as were approximately $2.6 million or almost 50% of the total revenues reported in EWSI's Third Quarter 2013 Form 10-Q.

61.     Throughout 2013, Nielson acted to support the impression that EWSI was successful in China, and to create a public expectation that EWSI's revenues from China would grow dramatically beyond the millions it had already reported earlier in 2013.  For example, on

December 12, 2013, EWSI posted to its website the transcript of a "Q&A Session" with Nielson.

In response to a question about the importance of China to EWSI's business, Nielson responded:

> China is very important to our growth plans. Economists predict that China will overtake the USA as the largest economy in the world in the near future and the opportunities for our company there are considered extremely attractive. Management is spending significant time there to help spur on the developments and the initiatives underway now and those being considered will give us much to look forward to in the years to come. The number of active initiatives is quite significant and we expect that the growth will be dramatic in the next year.

### The Reality Of The China Relationships

62.     EWSI's true relationship with YaZhuo and the China Companies bore no resemblance to the terms of the Operating and Management Services Agreements, the Lease and Operating Agreements, or EWSI's public descriptions of how the relationships worked.

63.     At no point in time did EWSI exercise an actual controlling interest in YaZhuo. It did not directly or indirectly manage or operate YaZhuo or any of the businesses of the China Companies that it claimed to manage through YaZhuo. It did not appoint any of its personnel to executive or senior management positions at YaZhuo. It did not receive any payments of any portion of YaZhuo's or the China Companies' profits, or revenues, or even the required quarterly management fees.

64.     The economic reality was that EWSI, through Nielson, agreed to pay the owners of the China Companies ("China Companies' Owners") to provide EWSI with financial data on the China Companies' operations at the end of each quarter, and EWSI reported that data as part of its financial results of operations.

65.     Specifically, Nielson had agreed to an arrangement whereby the China Companies' Owners continued to operate their companies independently of YaZhuo and EWSI, but at the end of each quarter, they provided to EWSI their unaudited (and unauditable) financial data for the quarter, and directly or indirectly through Consulting Firm employees, requested

payment from EWSI in an amount tied to the revenue data they had provided to EWSI. A Consulting Firm employee then forwarded the China Companies' financial statements to Nielson along with an invoice for "services." EWSI, at Nielson's instruction, then consolidated YaZhuo's results with its own, and for the China Companies, it reported their gross revenues and cost of goods sold in its results.

66.     Nielson knew that the data he received from the China Companies each quarter had been compiled by Consulting Firm employees from documents provided by the China Companies and knew or was reckless in not knowing that the data's reliability was questionable. He learned no later than October 2013, that at least one company did not even keep a general ledger and the financial data it was giving to EWSI at the end of each quarter was compiled by looking back in time at invoices, bank statements, and other documents.

67.     Nielson also knew that the written agreements between EWSI and YaZhuo, and between YaZhuo and the China Companies, did not call for payments (or share issuances) to be made *by* EWSI *to* anyone. Yet, each quarter, Nielson instructed EWSI employees to pay to Consulting Firm employees and the China Companies' Owners amounts that, in total, equated to 10% of the revenue that YaZhuo and each of the China Companies had reported to EWSI.

68.     At the conclusion of the second quarter of 2013, the China Companies' Owners invoiced EWSI for 10% of the revenue amounts they had reported to EWSI. Nielson received their invoices no later than August 1, 2013, and forwarded them to EWSI's outside accounting consulting firm, which recorded the fees on EWSI's books and records after Nielson confirmed to them that the amounts were an EWSI obligation.

69.     In subsequent quarters, to make the paper trail between EWSI and the China Companies' Owners less obvious, Consulting Firm employees sent Nielson quarterly invoices

which embedded the China Companies' Owners' fees with their own.   Specifically, at the

conclusion of the third and fourth quarters of 2013, Consulting Firm employees sent invoices to

Nielson that included, on behalf of the China Companies' Owners, requests for payment of

(a) 10% of the revenue amounts that the China Companies' Owners had reported to EWSI; and

(b) 10% of the revenue amounts that the China Companies had committed to permitting EWSI to

recognize in its fourth quarter of 2013 reported financials.

70.     Nielson approved of EWSI recording and reporting in its financial statements the

revenues that EWSI purportedly had earned from the written agreements between and among

EWSI, YaZhuo, and the China Companies, even though the written agreements did not reflect

the economics of the relationship between any of the parties.   Nielson never disclosed the true

relationship between and among EWSI, YaZhuo, and the China Companies to EWSI's auditors

or the public.

**How Nielson Paid The Scheme Participants In China**

71.     The China Companies' Owners wanted payment in cash, not stock, but EWSI

could only pay in stock.   Accordingly, Nielson repeatedly delayed making payments to the China

Companies' Owners and attempted to condition payment on successful inclusion of the China

Companies' revenue amounts in EWSI's audited financials.   Basilio Chen and a Consulting Firm

employee ultimately advised Nielson to pay or the China Companies' Owners would cease to

provide EWSI with their financial data at the end of each quarter.

72.     No later than July 2013, Nielson reached an agreement with Basilio Chen and

various Consulting Firm employees, pursuant to which EWSI would issue shares to certain

Consulting Firm employees, that they could sell and use the proceeds to compensate the China

Companies' Owners.

73.     Nielson made payments to these Consulting Firm employees principally through EWSI's employee stock ownership plan ("ESOP"), from a pool of shares designated for EWSI employees and consultants.   Nielson and others referred to these as "S-8 shares" or "shares from the S-8 pool" because EWSI registered the issuances by filing Forms S-8 with the SEC.   He instructed an EWSI officer when to issue the shares, to whom, and how many shares to issue.

74.     Prior to July 2013, EWSI issued approximately 15 million registered shares of EWSI common stock from the S-8 pool to Consulting Firm employees; and between July 2013 and July 2014, it issued nearly 65 million additional registered shares of EWSI common stock from the S-8 pool to Consulting Firm employees.   All of the S-8 shares were registered and could be (and were) traded in the open market without restriction.   The Consulting Firm employees informed Nielson that they intended to sell the shares and use the proceeds in part to pay the China Companies' Owners.   Brokerage records confirm that between June 2013 and August 2014, more than 65 million of the shares issued to them were sold.

75.     In early 2014, EWSI also issued approximately 2.5 million shares of EWSI common stock from the S-8 pool directly to certain China Companies' Owners.   Nielson signed consents authorizing these issuances pursuant to EWSI's "revised 2013 [sic] equity compensation plan as filed with the SEC in January 2014" and in exchange for "services" the China Companies' Owners supposedly performed in relation to the China Companies.   The shares were registered pursuant to a Form S-8 registration statement that appended EWSI's 2014 Equity Compensation Plan, the purpose of which was, among other things, "to compensate service providers, consultants, business associates and strategic partners . . . willing to receive compensation for services rendered in the form of [EWSI's common stock. . . ."   The China Companies' Owners were not eligible to receive shares under EWSI's ESOP.

76.     Nielson knew or was reckless in not knowing that the China Companies' Owners were not entitled to any payments (or shares) under any agreement between and among EWSI, YaZhuo, and the China Companies, did not have legitimate consulting agreements with EWSI, and did not provide bona fide services to EWSI.

77.     Nielson also knew the China Companies' Owners had not agreed to accept EWSI's shares as payment for their "services."  Nielson even facilitated a private transaction in which the China Companies' Owners sold their S-8 shares to an employee of the Consulting Firm shortly after receipt.  EWSI's auditor was never presented with the paperwork relating to these transactions and, upon information and belief, the share certificates were subsequently returned to EWSI and the shares were deposited back into EWSI's pool of S-8 shares.

**Nielson's Plan For 2014 And Beyond**

78.     Starting in 2014, and to lessen EWSI's reliance on S-8 shares to pay the China Companies' Owners and others, Nielson devised a plan to issue restricted Series A preferred shares to the Consulting Firm employee who owned and controlled YaZhuo in advance of when the shares would be needed to pay the China Companies' Owners and other participants in the scheme.  By issuing the restricted shares in advance, they would age, and be eligible for sale after a six-month holding period.

79.     In January 2014, Nielson authorized an EWSI officer to issue restricted Series A preferred shares to the Consulting Firm employee for this purpose.  He and the EWSI officer then conspired to create books and records that hid the real reason for issuing the shares, which was to enable the Consulting Firm employee to pay the China Companies' Owners for their participation in the scheme.  On January 29, 2014, after considering different ways to articulate the basis for the Series A share issuance, Nielson signed a consent, backdated to December 11,

2013, that identified as the basis for the issuance a supposed "term sheet" entered into with the Consulting Firm employee on December 10, 2012, and a supposed "agreement reached in princip[le]" with her on December 11, 2013.  At the time, the only agreement between EWSI and the Consulting Firm employee was a December 4, 2012 agreement, which, on its face, did not apply to the relationships between and among EWSI, YaZhuo, and the China Companies, and did not entitle the Consulting Firm employee to preferred shares.  There was no agreement or term sheet dated December 10, 2012, or December 11, 2013.

80.     EWSI's outside accounting consulting firm and its auditor were ultimately presented with Nielson's backdated December 11, 2013 consent.  The accounting consulting firm questioned Nielson and others as to the basis of the Series A preferred share issuance to the Consulting Firm employee.  Nielson was copied on a series of email communications in which the firm was falsely informed that the Series A shares were replacements for shares previously issued to the Consulting Firm employee.

**EWSI's Auditor Disallows The China Revenues**

81.     Nielson had multiple communications with EWSI's auditors throughout 2013 and into 2014.  He provided the auditors with the Operating and Management Services Agreements and the Lease and Operating Agreements knowing that they did not reflect the true relationship between and among EWSI, YaZhuo, and the China Companies, but at no point did he inform any auditor how the relationships actually functioned.  Nonetheless, Nielson's plan to recognize revenues relating to YaZhuo and the China Companies came to an end before EWSI could report its audited financial results for the fiscal year ended December 31, 2013.

82.     AUDITOR 1, the firm that had reviewed EWSI's first, second and third quarter 2013 financial statements, resigned effective December 30, 2013.

83.     AUDITOR 2 was retained effective December 30, 2013, to audit EWSI's fiscal year 2013 consolidated financial results.  On or about February 27, 2014, the lead engagement partner for AUDITOR 2 spoke by phone to the Consulting Firm employee who owned and controlled YaZhuo, and was told, among other things, that YaZhuo was not leasing, operating or managing any businesses in China.

84.     By email dated February 28, 2014, AUDITOR 2 resigned as EWSI's auditor, and informed Nielson of the engagement partner's conclusion that that the agreements between and among EWSI, YaZhuo and the China Companies "have no economic substance," that EWSI's statements about leasing and managing assets in China were false, and that EWSI should not account for any of the revenues or expenses from China.

85.     On March 1, 2014, AUDITOR 2 confirmed to Nielson that it was resigning from further representation of EWSI as its auditor and that the reasons stemmed from a disagreement with EWSI's management over the accounting treatment of EWSI's transactions in China.  AUDITOR 2 reiterated in the resignation letter that, based on the documents AUDITOR 2 had reviewed and interviews it conducted, "it does not appear that there is substance related to the 'lease' agreements to warrant [EWSI] to account for gross revenue and expenses for these China based operations."  EWSI made the letter public in a Form 8-K filed on March 7, 2014.

86.     By March 5, 2014, EWSI retained AUDITOR 3 to audit EWSI's year-end 2013 consolidated financial statements.  AUDITOR 3 spoke to AUDITOR 2 concerning the reasons for AUDITOR 2's withdrawal and also spoke to AUDITOR 1, which informed AUDITOR 3 that it had resigned for reasons similar to those given by AUDITOR 2.

87.     By April 5, 2014, AUDITOR 3 informed Nielson that it had not received any documentation to support EWSI's basis of accounting for the Lease and Operating Agreements

between YaZhuo and the China Companies.  AUDITOR 3 gave EWSI until April 7 to provide it

with the documentation.  On or about April 7, before AUDITOR 3 had completed its audit

procedures on the Lease and Operating Agreements, Nielson made the strategic decision to

suspend EWSI's agreement with YaZhuo, and informed AUDITOR 3.  AUDITOR 3 concluded

that, as a result, it would be inappropriate for EWSI to consolidate YaZhuo or to reflect any

revenues or expenses of the China Companies in EWSI's consolidated financial statements for

2013.

89.     On April 15, 2014, EWSI filed an annual report on Form 10-K for 2013, signed

and certified by Nielson, that included no revenues or expenses from YaZhuo or the any of the

China Companies.  EWSI did not publicly disclose the true relationship between and among

EWSI, YaZhuo, and the China Companies, but instead claimed that EWSI "analyzed the controls

and processes in place at [YaZhuo] and has concluded that consolidation is not proper at this

time pending implementation of appropriate financial systems and controls."  Nielson knew that

the real reason EWSI could not legitimately consolidate YaZhuo or report the revenue and

expenses of the China Companies on its financial statements was that the agreements between

and among EWSI, YaZhuo and the Companies were a sham and EWSI could not provide the

requested documentation to AUDITOR 3.

89.     On May 20, July 2, and August 6, 2014, EWSI filed amended Forms 10-Q for the

first, second and third quarters of 2013, which removed all of the revenues and expenses that

EWSI had previously reported related to YaZhuo and the China Companies.  Each of these

reports was signed and certified by Nielson.

90.     EWSI's total restated revenues from all sources were $0 in the first quarter of

2013 (compared with $229,000 originally reported, $4,000 of which was from China), $257,000

in the second quarter (compared with $2.7 million originally reported, $2.4 million of which was

from China), and $178,000 in the third quarter (compared with $5.3 million originally reported,

$2.6 million of which was from China).  The restatements removed not only revenues and

expenses that EWSI had improperly recognized relating to YaZhuo and the China Companies,

but also revenues and expenses that EWSI had improperly recognized in the third quarter

through a similarly structured Lease and Operating Agreement between EWSI and

COMPANY 1 based in New York.

### Nielson Returns To Ohio And Creates
### The False Impression That EWSI Has Great Profit Potential In The U.S.

91.     In July 2013, shortly before EWSI reported millions of dollars in improper

revenue from China, Nielson announced a potential acquisition in the U.S. that he claimed would

add millions more in revenue to EWSI, when he had no reasonable expectation of doing so.

92.     On July 9, 2013, in a Form 8-K filed with the SEC, and in a related press release,

Nielson announced that EWSI had signed a letter of intent to acquire WWS Associates, Inc. (also

known as "2TRG"), an e-waste processor that had facilities in Cincinnati, Ohio ("Cincinnati

Facilities") and Geneva, New York ("Geneva Facilities").  The release states that the acquisition

is expected to add more than $5 million in revenues to EWSI's business, solidify EWSI's market

position in Ohio, and expand its business on the East Coast.  Nielson signed the Form 8-K, was

quoted in the press release, and had ultimate authority over the content of both.

93.     The release also touts the fact that 2TRG holds an array of recycling credentials,

including eStewards, ISO and R2.  Such credentials are issued to a company by the authorizing

agency after successful completion of a comprehensive audit of all facilities and execution of a

licensing agreement for permission to advertise the credentials.  The credentials indicate an

adherence to higher standards in electronics waste processing that protects workers and the

environment, such as not shipping toxic e-waste to developing countries for dumping and not incinerating e-waste. These credentials are material to an e-waste recycler because many institutional and government customers are authorized to do business only with certified e-waste recyclers. EWSI's trading volume almost doubled on the release indicating its intent to acquire 2TRG, and its share price increased by more than 13%.

94.    EWSI closed on its acquisition of 2TRG on December 4, 2013. 2TRG's assets were inserted into a newly formed, wholly owned subsidiary of EWSI named E-Waste Systems Cincinnati, Inc. ("E-Waste Cincinnati").

95.    In a December 9, 2013 press release and a Form 8-K filed with the SEC on December 11, 2013, Nielson publicly announced the closing. The release reiterates that the acquisition is expected to add as much as $5 million in additional revenues during the first year. The release also claims that, with this acquisition, EWSI has increased its processing capacity, and expanded its e-waste recycling credentials. Nielson signed the Form 8-K, was quoted in the press release, and had ultimate authority over the content of both.

96.    At the time of the July and December 2013 announcements, Nielson had no reasonable expectation that 2TRG would generate anywhere close to $5 million in revenues in the first year after the acquisition. In May 2013, Nielson had learned from 2TRG's financial due diligence responses that 2TRG's revenues for 2012 were $3.8 million (down from $9.7 million in 2010) and, by December 5, 2013, 2TRG was on track to report less than $2.5 million in revenues for 2013.

97.    Since at least November 27, 2013, Nielson also knew that EWSI would be evicted from the Cincinnati Facility and would need move to a different facility, thereby losing all of the certifications that 2TRG held at that location. By the time of the December announcement, he

also knew or was reckless in not knowing that the Geneva Facility could not operate under these certifications because the company had not executed a licensing agreement.

98.     EWSI was officially evicted from the Cincinnati Facility on January 28, 2014 and, as of that date, none of its facilities was able to operate under any of the credentials that Nielson had touted.

99.     Despite these events, on January 28, 2014, Nielson announced to shareholders on a conference call that, as a result of the 2TRG acquisition and other activities in 2013, EWSI has added "significant processing capability" and "excellent customers" and that "eStewards, R2 and ISO standards are now [EWSI's] and we can share these with our partners around the globe." The transcript of Nielson's conference call was appended to a Form 8-K that EWSI filed with the SEC on February 4, 2014.  Nielson signed the Form 8-K and had final authority over its content and over the statements he made during the conference call.

100.    At the time he made these statements, Nielson knew or was reckless in not knowing that the certifications were location-specific and that no EWSI facility in Ohio, New York or anywhere else, held any such certifications.  Nielson also did not disclose that EWSI had been evicted from 2TRG's former Cincinnati Facility and was not operating in Ohio while it was building out its new facility in Springdale.

101.    On March 20, 2014, after almost two months with no operations in Cincinnati, E-Waste Cincinnati opened a new facility in Springdale, Ohio (the "Springdale Facility"), and commenced operations there.  The Springdale Facility held no e-waste processing certifications at the time.  Yet, in a March 21, 2014 press release announcing that EWSI had opened the Springdale Facility, EWSI announced that "EWSI brings . . . certifications from R2 and eStewards . . . to its subsidiaries, affiliates, brand licensees, and teaming partners around the

world . . . ."  Nielson had ultimate authority over the content of the release.  He  knew at the time

that EWSI's Springdale Facility did not hold the eStewards, ISO, or R2 certifications and also

that the eStewards administrative agency had admonished EWSI to remove all references to

certification from its public disclosures.

102.    By July 2014, Nielson was aware that E-Waste Cincinnati did not have the funds

to continue operations at the Springdale Facility, and Nielson authorized the Springdale manager

to operate with a skeleton crew.

103.    On August 19, 2014 and again on November 14, 2014, EWSI filed its Forms

10-Q for the second and third quarters of 2014, which Nielson signed and certified.  Instead of

publicly disclosing the negative developments at E-Waste Cincinnati, Nielson claimed in the

Management's Discussion and Analysis section of both reports that "[a] plan for hiring new

employees and business developers [was] being implemented" at E-Waste Cincinnati.  The filing

said nothing about the discontinuance of operations at the Springdale Facility.

104.    On November 25, 2014, former employees of EWSI's Springdale Facility filed

suit against EWSI and E-Waste Cincinnati in U.S. District Court for the Southern District of

Ohio for unpaid wages.  EWSI did not respond to the suit, and was found to be in default on

January 15, 2015; the employees' motion for default judgment was granted on April 17, 2015.

Although Nielson had been informed of this litigation, at no stage of the proceedings did EWSI

disclose the proceeding or judgment it to its shareholders as required by Item 103 of Regulation

S-K.

105.    On December 15, 2014, E-Waste Cincinnati was formally evicted from the

Springdale Facility.  EWSI has not operated in Ohio since then.  Although Nielson was informed

of this eviction, at no stage of the legal proceedings did EWSI disclose the litigation or judgment to its shareholders as required by Item 103 of Regulation S-K.

106.     On January 28, 2015, E-Waste Cincinnati was locked out of its Geneva Facilities after a long dispute with its landlord.  EWSI has not operated in New York since then.  Although Nielson was informed of this development, EWSI did not disclose to its shareholders that the last of its operating facilities had been closed.

107.     EWSI has had no operations in Ohio or New York, or anywhere else in the world, since these evictions.

108.     EWSI's last filing with the SEC was made on March 31, 2015.  The filing was a Form NT 10-K, signed by Nielson, stating that EWSI would not be able to file its Form 10-K for the year ending December 31, 2014, on time.

### Nielson's Acquisition And Sales Of EWSI Shares And His Failure To Comply With The Reporting Requirements

109.     On or about December 9, 2011, Nielson became EWSI's majority shareholder after he purchased 62.5 million shares of EWSI common stock from the former CEO of Dragon Beverage, representing 62.5% of the company's total outstanding shares.  On December 15, 2011, he filed a Schedule 13-G with the SEC, in which he falsely represented that his 62.5 million shares represented only 32.9% of the total outstanding shares of EWSI common stock, when, in fact, they represented 62.5% of the total outstanding shares, and he was EWSI's controlling shareholder.  Nielson belatedly reported his acquisition of these shares on Form 4 on August 10, 2012.

110.     Between July 2012 and April 2014, Nielson acquired an additional 17.5 million shares of common stock in lieu of salary; and, on or about July 18, 2013, he acquired an additional 50 million shares of common stock in exchange for the extinguishment of certain

debts owed to him by EWSI, including $735,539 in salary and expenses.  Nielson failed to report on Form 4 the common shares that he acquired on at least the following dates:  January 22, 2013; May 1, 2013; November 8, 2013; and April 3, 2014.  He belatedly reported on Form 4 the shares that he acquired on July 19, 2012.

111.    Nielson also acquired more than 450,000 shares of EWSI Series B preferred stock and 50,000 fully vested common stock options between August 2013 and May 2014.  He acquired 20,000 and 292,500 Series B preferred shares, respectively, on or about August 21, 2013 and May 30, 2014, in exchange for the extinguishment of certain debts owed by EWSI to him, including accrued salary and expenses.  He acquired 175,000 Series B preferred shares and 51,000 fully vested stock options on or about September 6, 2013, when he surrendered to EWSI 50 million previously acquired shares of common stock.  Nielson failed to report on Form 4 any of his acquisitions of Series B preferred shares or his acquisition of stock options.

112.    Additionally, between January 25, 2013, and June 27, 2014, Nielson sold more than 6.9 million shares of EWSI common stock for proceeds of just over $181,000.  Nielson did not report on Form 4 the disposition of any of the shares sold in these transactions, or the 50 million shares he surrendered to EWSI.

113.    Nielson also has never filed a Form 5 annual statement disclosing his beneficial interest in EWSI, or reflecting any of the transactions for which he failed to file a Form 4.

**FIRST CLAIM FOR RELIEF**

**Fraud In Violation Of Section 10(b) And Rules 10b-5(a), (b) And (c) Of The Exchange Act**

114.    The SEC repeats and realleges Paragraphs 1 through 114 of its Complaint.

115.    Nielson, in connection with the purchase or sale of EWSI securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, knowingly or recklessly (i) employed a device,

scheme or artifice to defraud; (ii) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

116.    By engaging in the foregoing conduct, Nielson violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) and Rules 10b-5(a), (b), and (c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), (b), (c).

## SECOND CLAIM FOR RELIEF

### Fraud In Violation Of Sections 17(a)(1), (2) And (3) Of The Securities Act

117.    The SEC repeats and realleges Paragraphs 1 through 114 of its Complaint.

118.    Nielson, in the offer or sale of EWSI securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly (i) knowingly or recklessly, employed any device, scheme, or artifice to defraud;  (ii) knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (ii) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would have operated as a fraud or deceit upon the purchaser.

119.    By engaging in the foregoing conduct, Nielson violated and, unless enjoined, is reasonably likely to continue to violate Sections 17(a)(1), (2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (2) and (3).

### THIRD CLAIM FOR RELIEF

**Falsified Books, Records Or Accounts**
**In Violation Of Section 13(b)(5) And Rule 13b2-1 Of The Exchange Act**

120.     The SEC repeats and realleges Paragraphs 36 through 91 of its Complaint.

121.     From no later than February 23, 2013 through at least August 6, 2014, Nielson knowingly circumvented or knowingly failed to implement a system of internal accounting controls to ensure that EWSI's financial statements were prepared in conformity with GAAP, or knowingly, directly or indirectly, falsified or caused to be falsified, books, records or accounts of EWSI that were subject to Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. §78m(b)(2)(A).

122.     By engaging in the foregoing conduct, Nielson violated and, unless enjoined, is reasonably likely to continue to violate Section 13(b)(5) of the Exchange Act, 15 U.S.C. §78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

### FOURTH CLAIM FOR RELIEF

**Deceit Of Auditors In Violation Of Rule 13b2-2 Of The Exchange Act**

123.     The SEC repeats and realleges Paragraphs 36 through 91 of its Complaint.

124.     From no later than February 23, 2013 through at least August 6, 2014, Nielson, directly or indirectly, made or caused to be made a materially false or misleading statement, or omitted to state, or caused another person to omit to state, a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (i) the audit, review or examination of EWSI's financial statements, or (ii) the preparation or the filing of a document or report required to filed with the SEC.

125.     Nielson also directly or indirectly took action to coerce, manipulate, mislead, or fraudulently influence an independent public or certified public accountant engaged in the

performance of an audit or review of EWSI's financial statements, or, he knew or should have known that such action, if successful, could result in rendering the EWSI's financial statements materially misleading.

126.    By engaging in the foregoing conduct, Nielson violated and, unless enjoined, is reasonably likely to continue to violate Rules 13b2-2(a) and (b) of the Exchange Act, 17 C.F.R. § 240.13b2-2(a), (b).

## FIFTH CLAIM FOR RELIEF

### False Certifications In Violation Of Rule 13a-14 Of The Exchange Act

127.    The SEC repeats and realleges Paragraphs 1 through 114 of its Complaint.

128.    Nielson falsely certified in connection with the filing of EWSI's First, Second and Third Quarter 2013 Forms 10-Q, and any subsequent amendments thereto, that he reviewed each such filing and (i) based on his knowledge, the filing does not contain any untrue statement of material fact; (ii) based on his knowledge, the financial statements fairly present, in all material respects, EWSI's financial results of operation; and (iii) that he is responsible for establishing and maintaining adequate internal controls over financial reporting, has designed and evaluated such controls, and has disclosed any changes or weaknesses to EWSI's auditor and audit committee.

129.    By engaging in the foregoing conduct, Nielson violated and, unless enjoined, is reasonably likely to continue to violate Rule 13a-14 of the Exchange Act, 17 C.F.R. § 13a-14.

## SIXTH CLAIM FOR RELIEF

### Violations Of Section 16(a) And Rule 16a-3 Of The Exchange Act

130.    The SEC repeats and realleges Paragraphs 13, 110 through 114 of its Complaint.

131. Nielson, by engaging in the conduct alleged above, and as a director and an officer of EWSI, failed to file or failed to file on a timely basis, the required statements of his beneficial ownership of EWSI securities and the required statements of changes in his beneficial ownership of EWSI securities.

132. By engaging in the conduct described above, Nielson violated and, unless enjoined, is reasonably likely to continue to violate Section 16(a) of the Exchange Act, 15 U.S.C. §78p(a), and Rule 16a-3 thereunder, 17 C.F.R. §240.16a-3.

### SEVENTH CLAIM FOR RELIEF

**Aiding And Abetting EWSI's Violations Of Section 13(a)**
**And Rules 12b-20, 13a-1, 13a-11, And 13a-13 Of The Exchange Act**

133. The SEC repeats and realleges Paragraphs 1 through 114 of its Complaint.

134. Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), requires issuers of securities registered under Section 12 of the Exchange Act, 15 U.S.C. § 78l, to file reports in conformity with the SEC's rules and regulations. Rules 13a-l, 13a-11, and 13a-13 of the Exchange Act, 17 C.F.R. §§ 240.13a-l, 240.13a-11, 240.13a-13, respectively, require the filing of factually accurate annual, current, and quarterly reports. Rule 12b-20 of the Exchange Act, 17 C.F.R. § 240.12b-20, requires an issuer to include in its annual and quarterly reports, in addition to the information expressly required to be included, such further material information as may be necessary to make the required statements, in light of the circumstances in which they are made, not misleading.

135. At all relevant times, through November 21, 2017, EWSI had a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, and was required to file accurate annual, current, and quarterly reports with the SEC. EWSI failed to comply with the required reporting provisions of the federal securities laws, and by reason of the foregoing,

violated Section 13(a) and Rules 12b-20, 13a-l, 13a-l l, and 13a-13 of the Exchange Act, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-l, 240.13a-l 1, and 240.13a-13.

136.    From no later than August 6, 2012 through November 21, 2017, Nielson knowingly or recklessly provided substantial assistance to EWSI's violations of Section 13(a) and Rules 12b-20, 13a-l, 13a-l l, and 13a-13 of the Exchange Act, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-l, 240.13a-l 1, and 240.13a-13.

137.    Accordingly, Nielson aided and abetted and, unless enjoined, is reasonably likely to continue to aid and abet EWSI's violations of Section 13(a) and Rules 12b-20, 13a-l, 13a-l l, and 13a-13 of the Exchange Act, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-l, 240.13a-l 1, and 240.13a-13. Therefore, Nielson is deemed to be in violation of these provisions to the same extent as EWSI, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Judgment:

### I.

Permanently restraining and enjoining Nielson from directly or indirectly violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Sections 10(b), 13(b)(5) and 16(a) [15 U.S.C. §§ 78j(b), 78m((b)(5), and 78p(a)] and Rules 10b-5, 13a-14, 13b2-1, 13b2-2 and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b-1, 240.13b2-2, and 240.16a-3]; and from aiding and abetting violations by others of Exchange Act Sections 13(a) and 13(b)(2)(A) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 24-.13a-13];

### II.

Prohibiting Nielson from acting as an officer or director of any issuer that has a class of

securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

### III.

Prohibiting Nielson from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)];

### IV.

Ordering Nielson to disgorge the proceeds of his illegal conduct described herein, plus prejudgment interest;

### V.

Ordering Nielson to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## VI.

Granting such other and further relief as this Court may determine to be just and

necessary.

Dated: Washington, D.C.                    Respectfully submitted,
       May 24, 2018

                                            __/s/ Suzanne J. Romajas_____
                                            Suzanne J. Romajas
                                            Virginia M. Rosado Desilets (DC Bar No. 482928)
                                            Sonia G. Torrico
                                            Securities and Exchange Commission
                                            100 F Street N.E.
                                            Washington, DC 20549-5971
                                            Direct: 202-551-4473
                                            Email: RomajasS@sec.gov

                                            Attorneys for Plaintiff